WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Steven Brewer,<br><br>　　　　　Defendant. | No. CR-12-01927-PHX-DJH<br><br>**ORDER** |

Pending before the Court is the Defendant's Amended Motion for Compassionate Release. (Doc. 1030). The Government has filed a Response in opposition (Doc. 1034) to which the Defendant has Replied. (Doc. 1038).

**I.　　Background**

The Defendant engaged in a "prime note bank fraud scheme to defraud potential borrowers out of fees that were paid up front to supposedly secure multi-million dollar business loans." (Doc. 1030 at 3). The Defendant, and co-defendants, "lured in small-business owners seeking commercial loans [and] [w]ith photoshopped financial documents, fake references, and lies, they fooled the victim into providing 'refundable' deposits, but Brewer and his co-defendants never provided a single loan." (Doc. 1034). Rather, they spent the deposits. (*Id.*)

On October 8, 2014, the Defendant was convicted by a jury of (Count 1) Conspiracy in violation of 18 U.S.C. § 371; (Counts 2-7) Wire Fraud in violation of 18 U.S.C. § 1343, and (Counts 8-28) Money Laundering, in violation of 18 U.S.C. § 1957(a). (Doc. 506).

He was sentenced on March 30, 2015 to sixty-months (60) on Count One, one hundred-eighty months (180) on Counts Two through Seven, and one hundred-twenty (120) months on Counts Eight through Twenty-eight, to run concurrently. As to each count of conviction, the Defendant was ordered to serve three-years of supervised release to run concurrently. (Doc. 713). He was also ordered to pay a special assessment fee of $2,800.00 and ordered to forfeit $11,750.93 in property. The Defendant was further ordered to pay restitution to each of the ten victims in amounts ranging from $60,000.00 to $1,462,312.94 for a total amount of $5,232,911.33.[1] (Doc. 800).

The Defendant is currently incarcerated in FCI Seagoville. He began his custody term on July 1, 2015 and is set to be released on November 3, 2028. The Defendant now seeks compassionate release due to the COVID-19 pandemic, his health conditions and his progress while incarcerated.

## II. Legal Standards

### a. Exhaustion of Remedies

The Defendant brings his Motion pursuant to 18 U.S.C. § 3582(c)(1)(A), recently modified by the First Step Act of 2018. *See* Pub. L. No. 115-391, § 603. That statute provides that a district court "may not modify a term of imprisonment once it has been imposed" unless the Congressionally mandated exception is present. 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824-25, 130 S.Ct. 2683 (2010). That exception is present when either the motion to modify sentence is brought by the Bureau of Prisons ("BOP") "or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added). The statutory language is unambiguous and not waivable. *See United States v. Weidenhamer*, 2020 WL 1929200 *2 (D. Ariz. Apr. 21, 2020) ("If the statutory language contains mandatory language . . . a court may not excuse a failure to exhaust") (citing *Ross v. Blake,* 136 S. Ct. 1850, 1858 n.2 (2016)). Thus, the Court may not consider a defendant's motion without proof that he meets this exhaustion requirement.

---

[1] The payments were ordered as join and several with the other co-defendants.

**b.    Extraordinary and Compelling Reasons**

If a defendant has exhausted his administrative remedies, he may bring a motion to the district court that extraordinary and compelling reasons nonetheless warrant his release. The First Step Act references the sentencing commission's policy statement for what should be considered as an extraordinary and compelling reason. Sentencing guideline section 1B1.13 n.1 defines "extraordinary and compelling reasons" for compassionate release. It includes considerations of 1) a defendant's serious advanced illness or medical condition; 2) whether the defendant is at least 65 and experiencing physical or mental health problems due to his/her advanced age, and the length of time incarcerated; 3) specific family circumstances; and 4) other reasons as determined appropriate by the Director of the BOP. *See* U.S.S.G. § 1B1.13 cmt. 1(A)-(B). The sentencing commission has not altered its guidance since the First Step Act was amended, thus, courts may independently determine whether such other reasons are present on a case-by-case basis and without deference to the BOP. *See United States v. Carter* 2020 WL 3458598, at *4 n.3, n.4 (D. Ariz. June 25, 2020) (citations omitted).

In considering motions for compassionate release, the Court must also "consider [ ] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c). Those factors include "the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims." *United States v. Trujillo*, 713 F.3d 1003, 1008 (9th Cir. 2013). A court should not grant a sentence reduction unless it determines that the defendant is not a danger to the safety of any other person or to the community. *See* U.S.S.G. § 1B1.13(2); s*ee also United States v. Baye*, 2020 WL 2857500 *10 (D. Nev. June 2, 2020) (citing cases). Therefore, the Court must find both extraordinary and compelling reasons for

compassionate release *and* that the 3553(a) factors support such release. *See United States v. Ruelas*, 2020 WL 5645093, *2 (D. Ariz. Sept. 22, 2020) (citations omitted).

### III.  Analysis

#### a.  Exhaustion of Remedies

The parties agree, as does the Court, that the Defendant has exhausted his administrative remedies. (Doc. 1034 at 8-10). Defendant's wife filed a compassionate release request on his behalf with the Warden on April 12, 2020. The Warden denied the request.[2] Thus, the Court agrees that he has exhausted his administrative remedies.

#### b.  Extraordinary and Compelling Reasons

The parties also agree that the Defendant's current health conditions meet the "extraordinary and compelling" reasons making him eligible for compassionate release. (Doc. 1034 at 10). The Defendant is fifty-eight years old and reports the following health issues: Stage IV Chronic Renal Failure, hypertension, obesity, hyperlipidemia, anemia, sleep apnea and prostate problems. *See* Brewer Decl. (Doc. 1030-1 at ¶56). He claims to be awaiting prostate surgery, and wearing a catheter. (*Id*. at ¶ 57) He also states that he has been hospitalized since being incarcerated due to his health issues, including in February 2020, for kidney failure. (*Id*. at ¶ 58 and 62). The Defendant states that he was also hospitalized for six-days in July with respiratory distress associated with contracting COVID-19. (*Id*. at ¶ 59)

The Court notes that the discretionary factors that the Warden considered in denying his home confinement request do not include his health status. (Doc. 1024 at 161). The Court further notes that the Warden's determination was made prior to the Defendant contracting COVID. Based on his medical history and current conditions, the Defendant meets the criteria for those at an increased risk of severe illness should he contract COVID-

---

[2] Ms. Brewer's request sought his release to "Home Confinement and/or Compassionate Release." (Doc. 1024 at 163). However, it appears that the Warden only considered the requirements of release to home confinement pursuant to 18 U.S.C. § 3582(c) and found that "[H]e is not being considered for priority consideration." *See* (*Id*. at 161) Nonetheless, the Court finds that the Defendant has exhausted his administrative remedies given that his wife's request was sought alternatively for compassionate release.

- 4 -

19.³ The Court notes that the BOP, including FCI Seagoville, has modified its operations, including altering visitation plans, to comply with the Center for Disease Control and Prevention guidelines. As of the date of this Order, Seagoville, however, had suspended visitations until further notice.⁴ On this record, the Court finds that the Defendant has sufficiently serious and multiple health conditions to meet the extraordinary and compelling reasons for compassionate release. However, that does not end the inquiry. The Court must now consider the sentencing factors and whether the Defendant poses a danger to the public.

### c. The 3553(a) Factors

As mentioned above, the district court may only reduce a term of imprisonment if, after considering the 3553(a) factors and upon a determination that the defendant is not a danger to the safety of any other person or to the community. "Dangerousness may, at least in some cases, encompass pecuniary or economic harm." *United States v. Reynolds*, 956 F.2d 192, (9th Cir 1992);*see also United States v. Rahmann,* 2020 WL 5042782 * 4 (D. Nev. Aug. 24, 2020) (citing same).

The Defendant summarily argues that he has learned his lesson and he is no longer a danger to society. (Doc. 1030 at 36). He submits that he has never denied the seriousness of his conduct but that his crimes were non-violent. (*Id*.) He further sets forth that he has been an exemplary prisoner, he has participated in educational and vocational programs, he worked in the Warden's business office for three-years, and that he has worked with others to ensure that they have re-entry skills and their GED. (Doc. 1030-1) (Decl. at ¶¶ 65-66). The Government contends that the Defendant poses a continuing danger to the public and that he should not be released. (Doc. 1034 at 10). The Government states that the over fifteen-year sentenced that was imposed by the district court reflects the danger that he poses to the public because prior to his conviction, he had amassed numerous prior convictions for fraud, forgery, and false statements. (*Id*. at 11) The Government also

---

³https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html last visited November 30, 2020.
⁴ As of the date of this Order, FCI Seagoville listed eighteen positive COVID-19 inmate cases and one staff case.

- 5 -

notes that the sentencing court adjusted his sentencing guideline range for his leadership role in the offense. (*Id.*) (Doc. 844 at 69).[5] The Government asserts that the sentence imposed resulted from the sentencing courts consideration of the 3553(a) factors including his prior criminal history, his character, and a need to protect society from potential future harm.

To be sure, the nature and circumstances of the Defendant's crimes are egregious. He engaged in his crimes for approximately three years. He was considered a manager or supervisor in the conspiracy, having recruited other co-defendants to participate in the scheme. (*Id* at 69) At sentencing, the Government pointed out that the Defendant controlled the money accounts and directed where the money went and the amounts to be provided to his family, including his wife and friends. (*Id*. at 67) He used the victim's money to purchase vehicles, vacations, interior design services and other personal and luxury items. For example, the Defendant and his wife stayed in a resort villa, he purchased Mercedes Benz and Lexus vehicles and bought luxury National Football League suite tickets for his family. The sentencing court described the Defendant's conduct in this way: "[i]t is different from the criminal conduct that the Court sees in many cases where people are committing crimes because of substance abuse addiction. They can't control themselves . . . This is the opposite end of that spectrum. This is conduct that is most . . . conscious and planned with full expectation of the devastation it will wreak on many people[.]" Indeed, at sentencing, the Government averred that some of the victims had experienced bankruptcies, divorces, lost careers, lost businesses and professional reputations. (*Id*. at 95) As for the issue of restitution, the Defendant was ordered to pay $5,232,911.33 in restitution to the victims of his offenses. However, neither party indicates whether he has made or attempted to make any restitution payments.[6]

The Defendant's remorse and his efforts while incarcerated weight in his favor. *See United States v. Parker,* 461 F.Supp. 3d 966 at 985-4 (C.D. CA May 21, 2020) (noting that

---

[5] Doc. 844 is the official transcript of sentencing proceedings held by Hon. Neil V.Wake.
[6] The record does reflect that the Defendant has made some monthly payments in the sum of $25. However it is not clear whether those payments relate to his special assessment fee or restitution. *See* (Doc. 1024 at 147).

where defendant who served twenty-two years of a life-sentence for tax fraud and drug conspiracy, extensive use of prison programing factored favorably in his compassionate release). But the record is unclear whether and to what extent all inmates similarly situated as the Defendant are required to participate in the types of programs he has completed. (Decl. at ¶ 68). While the Court credits the Defendant with the positive contributions that he has made to himself and others while incarcerated, and the contrition that he now displays, the 3553(a) factor related to deterrence remains relevant because he has only served five-years of the over fifteen-year sentenced imposed. *See United States v. Genovese* 2020 WL 4004164 *4 (S.D.N.Y. July 15, 2020) (noting that although defendant, a serial fraudster, has exhibited good behavior while incarcerated and earned a certificate for teaching business to inmates continues to pose a danger to the community). Notably, the Defendant reported to the presentence investigation report writer that he had previously participated in mental health counseling after his prior arrests in the 1980's and thereafter, he professed to having "turned a corner" by taking responsibility for his life's choices. *See United States v. Applewhite,* 2020 WL 137452 * 2 (D. Or. Jan. 13, 2020) (noting that the defendant committed bank robbery at an advanced age and that his medical ailments, while serious, do not render him incapable of attempting another robbery in the future).

To determine whether the Defendant poses a continuing threat to the community, one need only review his history and characteristics. The Defendant has a prior pattern of engaging in similar conduct as that for which he is currently incarcerated. First, throughout his adult life, he has used multiple alias names and social security numbers. His criminal history began in 1980 and includes various convictions for theft, forgery, theft by check, false statements to the Government, Mail Fraud, Conspiracy to Commit Mail Fraud, and Fraudulent Use of a Social Security Number. The Defendant had twelve prior convictions. (Doc. 844 at 72). While a number of these prior convictions did not count toward his criminal history calculation due to their age, his convictions for False Statements to Government Agency for which he was sentenced to 30 months in custody; Mail Fraud and Conspiracy to Commit Mail Fraud for which he was sentenced to concurrent terms of 56

- 7 -

months in custody, did. These prior convictions resulted in his designated criminal history category of three and a sentencing guideline range of 188-235 months.

Finally, regarding sentencing disparity, the Court notes that only one other co-defendant received a similar sentence as the Defendant's. Co-defendant Cutulle received a one-hundred-eight-month sentence for Counts Two through Twenty-eight of the Indictment and sixty months on Count One. Co-defendant Kirby received sixty-months on Counts One through Twenty-eight and co-defendant Rachel received a thirty-six-month term of custody for all counts of conviction. Thus, given his role in the conspiracy, any reduction in the Defendant's sentence would result in an unwarranted disparity.

In sum, the Court's analysis of the 3553(a) factors militate against the Defendant's compassionate release. A close review of the record convinces this Court that he remains a continuing danger to the public. The Defendant's length of conscientious planning and blatant personal use of the victims' income cause this Court great concern given his prior criminal history. As did the sentencing court, this Court finds the most salient factor in the Defendant's case is "the need to protect the public from crimes of the defendant." (*Id*. at 102). The Court concurs with the sentencing court that given the Defendant's long history of preying upon the public, "protection of the community then rises to the top of the lists of the goals of sentencing." Accordingly,

**IT IS ORDERED** denying Defendant's Motion for Compassionate Release (Doc. 1030).

Dated this 1st day of December, 2020.

Honorable Diane J. Humetewa
United States District Judge